**JUDGE HARJANI**

AO 91 (Rev. 11/11) Criminal Complaint

**FILED**
**5/4/2021**
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AUSA Alejandro G. Ortega, (312) 353-4129

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | CASE NUMBER: **21 CR 285** |
|---|---|
| v. | |
| CHRISTOPHER M. WILLIAMS, JR. | UNDER SEAL |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about May 23, 2019, at Dolton, in the Northern District of Illinois, Eastern Division, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | knowingly and intentionally distributing a controlled substance, namely, methamphetamine hydrochloride, a Schedule III Controlled Substance |

This criminal complaint is based upon these facts:

X Continued on the attached sheet.

Michael Donahue
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF)

Sworn to before me and signed in my presence.

Date: May 4, 2021

*Judge's signature*

City and state: Chicago, Illinois

SUNIL R. HARJANI, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT  
NORTHERN DISTRICT OF ILLINOIS | ss

## AFFIDAVIT

I, Michael Donahue, being duly sworn, state as follows:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). I have worked in this capacity since approximately March 2020. From approximately July 2017 until my employment as a Special Agent, I served as a Task Force Officer with the ATF while employed as a Police Officer for the Chicago Police Department (CPD). I began my tenure as a CPD Officer in November 2012.

2. My current responsibilities include investigating narcotics and firearm trafficking offenses. I am familiar with and have participated in a variety of investigative techniques, including developing cooperating sources and conducting source debriefings, physical surveillance, telephone toll analysis, and document analysis. I have been personally involved in investigations of controlled substances-related offenses involving the possession, sale, and distribution of narcotics in the Chicago metropolitan area, and investigations involving distribution of these substances by drug trafficking organizations. I also have experience in the methods used by persons and drug trafficking organizations to manufacture, purchase, transport, store, and distribute illegal drugs.

3. This affidavit is submitted in support of a criminal complaint alleging that CHRISTOPHER M. WILLIAMS, JR. has violated Title 21, United States Code, Section 841(a)(1) by distributing a controlled substance, namely, methamphetamine.

Because this affidavit is being submitted for the limited purpose of establishing probable cause supporting a criminal complaint charging WILLIAMS with the above offense, I have not set forth all the information I'm aware of related to this investigation. I have summarized facts to establish probable cause to believe that the defendant committed that offense.

4.  This affidavit is based on my personal knowledge, my experience and training, information provided to me by other law enforcement agents, the experience and training of those agents, interviews of a confidential source, my preliminary review of consensual recordings, my preliminary review of draft—not final— transcripts of those recordings, and physical surveillance. This affidavit contains summaries of some of those recordings, with my understanding of the meaning of portions of the conversations in brackets.

## FACTS SUPPORTING PROBABLE CAUSE

### *Brief Summary*

5.  As set forth in more detail below, on or about May 23, 2019, WILLIAMS sold approximately 444.7 grams of methamphetamine hydrochloride to a confidential informant ("CS1") working for ATF.[1] CS1 arranged the sale through consensually-recorded calls and text messages, some of which are summarized below.

---

[1] According to CS1, CS1 knew WILLIAMS personally, and WILLIAMS had told CS1 on at least one occasion that he (WILLIAMS) sold narcotics, during a conversation the two had at Dolton Bowl where WILLIAMS worked.

According to a law enforcement database, CS1 has prior convictions for criminal trespass to real property, disorderly conduct – breach of peace, narcotics offenses, leaving the scene of an accident, reckless conduct, and multiple traffic violations. CS1 has received approximately $10,400 in monetary compensation for his/her cooperation with the ATF. I believe that the

2

### *Negotiating the Meth Sale*

6. On or about May 15, 2019, at approximately 6:42 p.m., CS1 made a consensually recorded call to WILLIAMS, who was using WILLIAMS' Phone.[2] After CS1 identified him/herself, WILLIAMS said he would save CS1's number and call CS1 back.

7. On or about May 17, 2019, at approximately 4:17 p.m., CS1 made a consensually recorded call to WILLIAMS, who was using WILLIAMS' Phone. During the call CS1 asked, "Which one am I going to come out cheaper with? You know what I'm saying? Which one I'm going to make the most money with? The half . . . the half a book for the 25K [one-half kilogram of heroin for $25,000], or the one for the five thousand [one pound, or approximately 454 grams, of methamphetamine for $5,000] and I could just go crazy?" WILLIAMS replied, "Half a book [one-half kilogram of heroin]." CS1 replied, "Man, look, man, you just trying to get $25,000." CS1 laughed, and WILLIAMS replied, "Naw, for real . . . 'cause with that [one-half kilogram of heroin] you still could cut it [dilute the purity of the heroin by combining it with another substance to increase the quantity]." CS1 asked, "Is it pure dogfood [low-

---

information provided by CS1 is reliable because, among other reasons, it has been corroborated by consensually recorded conversations and transactions, including those summarized in this affidavit.

[2] Law enforcement has identified WILLIAMS as the speaker in the consensually recorded conversations summarized in this affidavit based on, among other things, the following: (1) according to CS1, CS1 is familiar with WILLIAMS' voice and communicated with WILLIAMS during the consensual recordings; (2) according to CS1, WILLIAMS' phone number is that for WILLIAMS' phone; and (3) CS1 arranged for a meeting with WILLIAMS on May 23, 2019 by communicating with WILLIAMS over WILLIAMS' Phone, and law enforcement identified WILLLIAMS as a participant in that meeting by comparing video footage of him to WILLIAMS' driver's license photograph.

3

quality heroin], like, is it pure D [undiluted heroin], or is it like mixed?" WILLIAMS answered, "It's pure D."

8. Later during the call CS1 asked WILLIAMS how CS1 could profit off the $5,000 worth of methamphetamine. WILLIAMS explained that CS1 could put the meth into pills and sell the resulting product for around $25,000. More specifically, CS1 said, "[I]f I give you the little six [$6,000], the little six or five thousand [$5,000] . . . for the uhhh... for the uhhh... what that gonna give me a pound of, um, a pound of crystal meth, right?" WILLIAMS answered, "Yeah." Later CS1 said, "So say if I give you five thousand, okay, I give you the five thousand for that . . . what you . . . what you . . . what you say I make back [in profit]?" WILLIAMS asked, "[W]hat you trying to turn it into?" CS1 said: "If I put the shit . . . if I put the shit in the pills like you was telling me, like you was telling me I should just put the shit in the pills, what do I make back?" WILLIAMS responded, "You gonna make at least, shit, what, a pound of that shit, then it depends how strong you want 'em [the pills], though. The pills, depending how strong you want 'em . . ." CS1 interjected, "I don't want shit, I don't want to make the shit too strong to kill nobody, bro'." WILLIAMS continued, "Right, so, shit, you probably could make like 25,000 pills, though [from a pound of methamphetamine]." CS1 asked, "25,000 . . . how much did you make off, how did you make off a pound, a pound of your shit? How much did you make?" WILLIAMS replied, "Shit, 25." CS1 said, "You made . . . I'm sayin', though, how much money you make?" WILLIAMS answered, "25 . . . K" [$25,000]. CS1 asked, "[Y]ou made 25K off your $5,000 [worth of methamphetamine]? WILLIAMS responded, "Yeah, that's why

4

I said you get it turned all into pills, and then, shit, even if you sell 'em $1 a pill to motherfuckers who buying four, five hundred pills, you still getting your money back." CS1 then asked WILLIAMS if he could sell CS1 heroin for a bargain price and WILLIAMS declined.

9. Toward the end of the call, CS1 said, "Well shit . . . I'm going to call you phone soon as I'm ready. I'm gonna call your phone ASAP . . . soon as I'm ready for that order, bro'." WILLIAMS replied, "Alright".

10. On or about May 21, 2019, at approximately 9:14 p.m., CS1 made a consensually recorded call to WILLIAMS, who was using WILLIAMS' Phone. CS1 stated, "I'm going to be ready [to purchase one pound of methamphetamine] Thursday." WILLIAMS replied, "Alright, for sure. Alright, I got you." Later in the conversation, CS1 asked, "So how much [money] I got to bring you all together? What's the deal you going to give me?" WILLIAMS replied, "Shit, bro', you come anywhere around five [$5,000], I got you." CS1 stated, "Five bucks [$5,000], you got me?" WILLIAMS replied, "Yeah, motherfuckers really want like fifty-five . . . six bucks [$5,500 to $6,000] but you come around five bro', I got you." Later CS1 stated, "But shit, I got the bread [money]. So I'm just waiting . . . I'm just waiting . . . just waiting on my homie. He gon' be ready. Motherfucker I know. A little chemist I know and shit. I going to put you into him and shit." WILLIAMS said, "We going to get it all together."

11. The night before the sale, on or about May 22, 2019, at approximately 8:39 p.m., WILLIAMS, using WILLIAMS' Phone, called CS1. During the conversation

5

WILLIAMS stated, "I said hell yeah . . . I said hell yeah, I'll be ready [to sell CS1 methamphetamine]. Just call me." CS1 replied, "Aw, no, I'm just making sure, man." Later, WILLIAMS said, "Hell yeah . . . so just hit me up tomorrow when you get it [money] all together . . . [W]e gon' make it happen."

### *The May 23, 2019 Sale*

12.     On or about May 23, 2019, at approximately 11:52 a.m., CS1 made a consensually recorded call to WILLIAMS, who was using WILLIAMS' Phone. CS1 said, "I was just trying to see if you was still going to be ready for me around 1:00 or a little bit after 1:00." WILLIAMS replied, "Yeah." Later in the conversation, CS1 stated, "Yeah . . . I'm going to bring . . . I'm going to bring my motherfucking bag, too . . . 'cause I know, I don't know how big that shit [methamphetamine] is, bro'." WILLIAMS replied, "Right, . . . it ain't that big but definitely going to need a bag though." CS1 stated, "I thought that shit was going to be big." WILLIAMS replied, "Hell naw, it ain't going to be that big but you still going to need a bag though."

13.     Later that day, at approximately 1:30 p.m., CS1 made a consensually recorded call to WILLIAMS, who was using WILLIAMS' Phone. During the conversation CS1 asks, "What kind of car you in?" WILLIAMS states, "I'm in my car . . . I'm in the Impala."

14.     About eight minutes later, at approximately 1:38 p.m., CS1 made a consensually recorded call to WILLIAMS, who was using WILLIAMS' Phone." During the call WILLIAMS said that he was in the front of bowling alley in Dolton, and CS1 said that he/she was coming to meet WILLIAMS.

6

15. As captured by CS1's audio and video recording devices, which began recording at approximately 1:36 p.m., CS1 entered the front passenger side of WILLIAMS' car, an Impala which—according to the Illinois Secretary of State—was registered to WILLIAMS and another person and was parked in the bowling alley parking lot. CS1 shook hands with WILLIAMS, who retrieved a shoe box from the back seat. WILLIAMS then retrieved a bag from the shoe box and gave it to CS1, who unzipped the bag and smelled inside. CS1 then gave WILLIAMS $5,200, which law enforcement had provided CS1 before the meeting and which WILLIAMS counted. CS1 then exited the vehicle and WILLIAMS drove away. Below are screenshots captured by CS1's video recording device showing (1) WILLIAMS, and (2) the shoebox from which WILLIAMS retrieved the narcotics prior to CS1 exiting WILLIAMS' car:





16. Law enforcement conducting surveillance then observed CS1 exit WILLIAMS' vehicle and enter the bowling alley. CS1 proceeded out the back exit of the bowling alley and was eventually picked up by law enforcement. CS1 then provided law enforcement with a ziplock plastic bag containing a white substance. According to a laboratory test conducted by the U.S. Drug Enforcement Administration, the contents of the plastic bag tested positive for the presence of methamphetamine hydrochloride with a weight of 444.7 grams.

17. About 14 minutes later, at approximately 1:50 p.m., WILLIAMS, using WILLIAMS' Phone, called CS1. During the conversation CS1 said, "I was just making sure we good." WILLIAMS responded, "Ah, yeah, yeah, we good, bro'."

8

## CONCLUSION

18. Based on the foregoing, there is probable cause to believe that on or about May 23, 2019, CHRISTOPHER M. WILLIAMS JR. distributed approximately 444.7 grams of methamphetamine, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

Michael Donahue
Special Agent
Bureau of Alcohol, Tobacco, Firearms
and Explosives

SUBSCRIBED AND SWORN to before me on May 4, 2021.

Hon. Sunil R. Harjani
United States Magistrate Judge